# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 3176 | **DATE** | 3/9/2012 |
| **CASE TITLE** | United Central Bank vs. Dany Investment, LLC *et al.* | | |

## DOCKET ENTRY TEXT

Plaintiff UCB's motion for summary judgment [ 42], its motion to dismiss counterclaims [37], and its motion to strike affirmative defenses [40] are denied. A status hearing is set for March 28, 2012 at 2:30 pm. The parties should meet and prepare a draft preliminary pretrial scheduling order and submit a copy to chambers a day before the hearing.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

This is a loan collection and mortgage foreclosure case. In May 2008, Mutual Bank, an Illinois bank, made three loans to defendants for a total of approximately $6 million. This money was used by defendants (Umar F. Paracha and companies he owned) to buy a hotel in the Wisconsin Dells, a hotel in Davenport, Iowa, and a truck stop gas station in Hampshire, Illinois.

In July 2009, the FDIC and Illinois regulators took over Mutual Bank and sold its assets to United Central Bank ("UCB"), located in Texas. UCB filed this action to collect unpaid principal plus interest and to foreclose on properties securing the three loans. UCB has asserted eight counts.

The Paracha defendants filed a counterclaim, asserting four fraud-based claims. The counterclaim alleges generally that Mutual Bank engaged in bank fraud. Here is an overview from the counterclaim: "The Bank specifically designed a scheme to defraud the Investors [*i.e.* the Paracha defendants] into buying these three (3) properties at an artificially inflated price, and grossly exaggerate the income produced from said properties, so that the Bank could personally profit hundreds of thousands of dollars, get the Investors to operate, repair and renovate the properties and so that the Bank could use the Investors' mortgage money to pay all the properties past bills and liens and to falsely claim an increase in the Bank's value." (Counterclaim "CCl." ¶ 4.) Phony appraisals and false income statements were allegedly given to defendants to induce them to buy the properties. Problems allegedly were not disclosed. For example, the Davenport hotel was either closed or in foreclosure for most of the time since 2004. (¶ 28.) The bank also allegedly represented that the two hotels were under the "Howard Johnson" franchise when in fact they were terminated before the sale. The entire transaction -- the three loans, mortgages, guaranties -- was allegedly controlled by Mutual Bank's president, Amrish Mahajan, and the sellers of the properties "turned over all control" to Mutual Bank and "only signed their name on the closing date." (¶ 6.) Mutual Bank allegedly engaged in similar fraud with many others going back to at least 2003. (¶ 8.) Sometime after defendants purchased the properties -- the exact time is not clear -- they realized they were worth much less than Mutual Bank had represented. (¶ 7.) Defendants spent $2 million repairing the Wisconsin Dells hotel, $200,000 on the Davenport hotel, and

## STATEMENT

$70,000 on the truck stop in Illinois. (¶ 31.) They are seeking to recover this money. They also allege that $700,000 was placed in a construction escrow at closing but that they never received the money, which was taken by Mutual Bank. (¶¶ 39-40.) The counterclaim asserts claims for fraud, negligent misrepresentation, conversion, and unjust enrichment.

This case, according to UCB, is simply a "straightforward" mortgage foreclosure case -- one that can be resolved by motions without the need for any discovery. UCB filed three motions. The first is a motion for summary judgment. It is based on defendants' answers in which they admitted that they signed the loan documents and have not made any payments on the three loans. The second is a motion to dismiss the counterclaims. UCB argues that the fraudulent inducement allegations are barred by (among other things) the Illinois Credit Agreements Act, 815 ILCS 160/1 *et seq.* (the "Credit Act"), which precludes any actions based on promises or financial advice given in connection with a "credit agreement," such as the loans here, unless those promises are in writing signed by both parties. *See* Pl. Br. at 5-6. Although UCB believes the counterclaim should be dismissed, it also argues that this question is independent of whether summary judgment can be granted on the outstanding loan amounts. The third is a motion strike two affirmative defenses.  It essentially raises the same issues raised by the first two motions.

The larger question looming over the many specific legal arguments raised in the three rounds of briefing is this:  whether defendants should be given a chance to conduct discovery?  After carefully reviewing the briefs and numerous exhibits, we conclude that, despite many potential problems with defendants' claims and defenses, the better course is to allow discovery to go forward now, to allow defendants an opportunity to further develop their case. Given that these arguments will likely be re-visited on a motion for summary judgment, we will not address all the legal arguments raised in the briefs but will only discuss those points necessary to explain our ruling.

A few general observations first. We have read through the loan documents. They are complex and this transaction is not easy to track or see how the loans and mortgages all relate to each other. Defendants apparently were not required to put up any money and the loans were secured only by second and third mortgages on properties which, according to defendants, had no equity. Only some of the properties were mortgaged. The closing dates are staggered, and it is not clear why. It is also not clear how the money was distributed.  For example, a question exists about what happened to the $700,000 construction escrow. After the loans were made, the defendants did not make any payments (with one exception discussed below), and Mutual Bank did not take any action to collect on those payments insofar as we can tell.  In sum, based on an initial review, it is not clear this is a typical or straightforward transaction as UCB claims.

Related to the above point are the hovering allegations about Mutual Bank's alleged pattern of fraud going back to 2003. Defendants seem to believe that Mutual Bank's ongoing problems are well-known.  Perhaps for this reason, they offer few details, which does not help their case. Nevertheless, in reviewing these briefs, this Court became aware of a separate case filed in this district by the FDIC against Mutual Bank's former owners (including Amrish Mahajan) and others (such as the Bank's lawyer, James Regas). *Federal Deposit Ins. Corp. as Receiver for Mutual Bank v. Amrish Mahajan, et al.*, N.D. Ill., Case No. 11-7590 (now pending before Judge Kendall). We read the FDIC complaint. It is 46 pages and describes in detail how Mahajan, Regas, and others at Mutual Bank, from 2004 to 2009, engaged in a scheme by making high-risk loans to a small group of  high-volume borrowers, many in the hotel industry. (Cmplt. ¶¶ 30-32.) Unlike the counterclaim here, the complaint contains a clear description of the alleged wrongdoing.  It seeks to recover over $115 million lost by the Bank in 12 high-dollar loans. (¶ 1.) The loans were allegedly made without proper documentation, based on inflated appraisals (in some cases, obtained *after* the loan was funded), and without attention being given to the borrower's ability to pay. (¶ 32.) Mutual Bank also failed to track the performance of its loans. (¶ 33.)  In some cases, money placed in construction escrows was taken and not used to repair the property. (¶ 67.e; ¶ 89.b.; ¶ 101.d).  In other cases, guaranties were forged and loan terms were changed at closing. (¶¶ 32, 94.) The FDIC complaint paints a picture similar to the one in the counterclaim, albeit with greater detail and clarity. Both involve similar people (*e.g.* Mahajan and Regas),

**STATEMENT**

during a similar time frame, employing a similar modus operandi of inflated appraisals and suspicious loan documents.

A third general point is that UCB was not around when these loans were made. It therefore must rely on the record-keeping practices of Mutual Bank. UCB claims the records are reliable and accurately account for all payments made by defendants based on the fact that Mutual Bank "[u]sed standard account tracking software recognized throughout the banking industry to manage a large number of loans." (Mujtaba Aff. ¶ 9.) In light of the FDIC allegations described above, which specifically mention problems with record-keeping, defendants should be at least given the opportunity to challenge this factual claim that the records in this case are accurate.

Turning to the specific allegations, we begin with the allegation that Mutual Bank took the $700,000 construction escrow. *See* CCl. ¶ 72 ("The Counter Defendant Bank never released this escrow money to the Counter Plaintiffs and wrongfully took, via conversion, the $700,000.00 that was in escrow."). In our view, this allegation is sufficient to survive a motion to dismiss. UCB responds that the allegation is "unverified" and not supported "by affidavits or authenticated documents." (Pl. Reply at 5 and n.6.) While true, this argument is premature at the motion to dismiss stage. So, at a minimum, discovery must be undertaken on this issue, which will likely require the parties to investigate the larger transaction and business relationship.

Another fact issue is whether the outstanding loan amounts are accurate. Defendants question whether they are, and assert that this issue should be resolved through discovery. (Defs. Br. at 4.) Although defendants again do not provide much detail or proof to back up their general allegation, they have alleged that they paid $28,000 each month on the truck stop property. *See* CCl. ¶ 36 ( "No actual monthly payments were ever made on the two Hotels. The Investors did pay the $28,000.00 monthly payments on the truck stop property to the Bank for the first year."). UCB's Loan Payoff Statements do not explicitly acknowledge these payments. Related to this point, we note that the 420109 Note required payment of $1,175,000 in principal, but the Loan Payoff Statement lists the unpaid amount as $1,116,765.65, which is approximately $58,000 less, thus suggesting some payments were made. Perhaps there is a simple explanation, but it needs to be spelled out clearly, which can be done through discovery. Although the above amounts are relatively small, they still need to be pinned down with more precision.

We next consider the larger fraud allegations, which are more vague and rest on shakier grounds. More specifically, if defendants are merely relying on a fraudulent inducement theory -- namely, that Mutual Bank made various oral representations about the value and income potential of the three properties -- then we fail to see how they can avoid the application of the Illinois Credit Act. In its brief, UCB has set forth arguments and case law supporting its position, and defendants have offered little in response. In various places in their counterclaim, defendants seem to be suggesting a broader theory of fraud, something more than mere fraudulent inducement by oral representations. This includes the allegation that $700,000 was stolen and other more vague claims that the entire transaction was a "sham" and that the defendants "never saw any part of this money." *See, e.g.*, CCl. ¶ 34; ¶ 35 ( "Another part of the fraudulent scheme was for the Bank to use the Investors' mortgage to pay all past bills and liens."); ¶ 38 ( "The initial capital of $1.175 million dollars was a sham orchestrated by the Bank, which had never secured any financing or sufficient fund [sic] to issue the mortgages for the purchase of the three (3) aforementioned properties."). These allegations, at this point, are ill-defined as defendants have not articulated a plausible description of how the fraud was carried out and what money was stolen. These allegations are not sufficient to survive a motion to dismiss, especially in light of the requirements of Rule 9(b). However, because we have already held that the four claims can go forward based on the allegations described earlier, we will not dismiss these claims now. It is possible defendants could develop further evidence regarding them and then seek to file an amended complaint.

But defendants should be mindful that we are giving them the benefit of the doubt in denying these motions, which is consistent with the procedural standards. Going forward, however, they will have the burden of developing concrete evidence and adequate legal arguments. Their filings to date have not been inspiring. Their briefs are short, conclusory, with too many typos, and with little legal authority; the

**STATEMENT**

counterclaim contains too many vague and confusing allegations (such as the allegations about the ill-defined "grace periods"); the counterclaim also has attachments missing (*see* Ex. F); defendants' answers to the complaint and to the statement of material facts are not consistent. More substantively, a number of questions -- many raised by UCB in the briefs and some noted by this Court in reading the briefs -- will have to be addressed. For example, UCB has questioned how defendants could have been unaware of the alleged flaws in the properties, such as the loss of the Howard Johnson franchise status or tax delinquencies, since much of this information was public knowledge. Defendants seem to believe that they could simply trust Mr. Mahajan and sign documents he put in front of them, but they have not articulated a viable legal theory for this position. It also will not be sufficient for defendants simply to point to the larger fraud allegations made by the FDIC and others against the bank. The thrust of the FDIC complaint is that Mutual Bank was careless in lending to borrowers who had bad credit, who did not put any of their own money in the deal, and who even (in one case) personally used money meant for construction repairs. It further alleges that Mutual Bank was lax in pursuing these borrowers. In short, this complaint does not portray the borrowers as victims of the fraud.  A few similarities exist here. Defendants admit that they put no money into the deal, they mortgaged properties with no equity in them; and they were allowed to skip loan payments. At this point, these are merely questions, which reinforces why discovery is appropriate.  All these issues can be addressed in more detail on a summary judgment motion filed after discovery at which time the Court and the parties will have the benefit of a more complete factual record.